**UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: THE HONORABLE LEO M. GORDON, SENIOR JUDGE

| | |
|---|---|
| DONGKUK S&C CO. LTD., Plaintiff, v. UNITED STATES, Defendant, and WIND TOWER TRADE COALITION, Defendant-Intervenor. | Court No. 26-03136 |

**MEMORANDUM OF LAW IN SUPPORT OF THE RULE 56.2 MOTION OF PLAINTIFF, DONGKUK S&C CO. LTD., FOR JUDGMENT ON THE AGENCY RECORD**

Jarrod M. Goldfeder
MacKensie R. Sugama
Joo Young (Adelia) Kim
**TRADE PACIFIC PLLC**
700 Pennsylvania Avenue, SE
Suite 500
Washington, D.C. 20003
(202) 223-3760

Dated: October 13, 2026

*Counsel to Plaintiff Dongkuk S&C Co., Ltd.*

# TABLE OF CONTENTS


**TABLE OF CONTENTS** .......... i

**TABLE OF AUTHORITIES** .......... ii

**I. STATEMENT PURSUANT TO RULE 56.2(C)** .......... 1

- **A. Administrative Determination under Review** .......... 1
- **B. Issues Presented** .......... 2

**II. STANDARD OF REVIEW** .......... 2

**III. STATEMENT OF FACTS** .......... 4

**IV. SUMMARY OF ARGUMENT** .......... 6

**V. ARGUMENT** .......... 8

- **A. Commerce's Determination to Exclude Gains on the Disposition of Tangible Assets from the G&A Expense Ratio Calculation Was Not Supported by Substantial Evidence** .......... 8
- **B. Commerce's Determination to Calculate CV Profit and Selling Expenses Using Financial Data of Surrogate Producers of Non-Comparable Merchandise Was Not Supported by Substantial Evidence** .......... 11
  1. **Commerce's Determination to Not Use DKSC's Own Actual Profit Data to Calculate the CV Profit and Selling Expense Ratios Was Unsupported by Substantial Record Evidence** .......... 13
  2. **Commerce's Determination to Use the Financial Data of Husteel and SeAH Was Unsupported by Substantial Evidence** .......... 17

**VI. CONCLUSION** .......... 21

# TABLE OF AUTHORITIES

## Statutes

5 U.S.C. § 706(2)(A)....................................................3

19 U.S.C. § 1516a(b)(1)(B)(i)....................................................2

19 U.S.C. § 1677b(e) ....................................................11

19 U.S.C. § 1677b(e)(2)(A) .................................................... 11-13

19 U.S.C. § 1677b(e)(2)(B) ....................................................12, 13

28 U.S.C. § 1581(c) ....................................................2

## Court Precedent

Atar S.r.l. v. United States, 730 F.3d 1320 (Fed. Cir. 2013) ....................................................16

Burlington Truck Lines v. United States, 371 U.S. 156, 83 S.Ct. 239 (1962)....................................................4

Ceramica Regiomontana, S.A. v. United States, 10 CIT 399, 636 F. Supp. 961 (1986), aff'd, 810 F.2d 1137 (Fed. Cir. 1987)....................................................3

Consolidated Edison Co. of New York v. NLRB, 305 U.S. 197 (1938) ....................................................4

Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 86 S.Ct. 1018 (1996) .................................................... 3-4

Geum Poong Corp. v. United States, 26 CIT 322, 193 F.Supp.2d 1363 (2002)....................................................13

Loper Bright Enterprises v. Raimondo, 603 U.S. 369, 144 S.Ct. 2244 (2024) ....................................................3

Nucor Corp. v. United States, 32 CIT 1380, 594 F.Supp.2d 1320 (2008)....................................................4

PAM, S.p.A. v. United States, 582 F.3d 1336 (Fed. Cir. 2009) ....................................................4

Rhone-Poulenc, Inc. v. United States, 20 CIT 573, 927 F. Supp. 451 (1996)....................................................3

SeAH Steel Corporation v. United States, 513 F.Supp.3d 1367 (Ct. Int'l Trade 2021)....................................................16

SKF USA Inc. v. United States, 263 F.3d 1369 (Fed. Cir. 2001)....................................................3

Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456 (1951)....................................................4

**Agency Administrative Determinations**


Brake Rotors from the People's Republic of China, 69 Fed. Reg. 42,039 (Dep't Commerce July 13, 2004) (final results 9th AD new shipper rev.), and accompanying Issues and Decision Memorandum (Dep't Commerce July 6, 2004) ....................10

Certain Carbon and Alloy Steel Cut-to-Length Plate from France, 82 Fed. Reg. 16,363 (Dep't Commerce Apr. 4, 2017) (AD inv. final determ.), and accompanying Issues and Decision Memorandum (Dep't Commerce Mar. 29, 2017) ....................9

Certain Cold-Rolled Carbon Steel Flat Products from Taiwan, 67 Fed. Reg. 62,104 (Dep't Commerce Oct. 3, 2002) (AD inv. final determ.), and accompanying Issues and Decision Memorandum (Dep't Commerce Sept. 23, 2002) ....................9

Certain Frozen Warmwater Shrimp from Ecuador, 71 Fed. Reg. 34,888 (Dep't Commerce June 16, 2006) (prelim. results AD new shipper rev.) ....................16

Certain Lined Paper Products from India, 76 Fed. Reg. 10,876 (Dep't Commerce Feb. 28, 2011) (final results AD admin. rev.), and accompanying Issues and Decision Memorandum (Dep't Commerce Feb. 18, 2011) ....................15

Certain Oil Country Tubular Goods from the Republic of Korea, 87 Fed. Reg. 55,398 (Dep't Commerce Sept. 9, 2022) (amended final results AD review; 2016-2017) ....................16

Certain Oil Country Tubular Goods from the Republic of Korea, 84 Fed. Reg. 24,085 (Dep't Commerce May 24, 2019) (final results AD admin. rev.; 2016-2017), and accompanying Issues and Decision Memorandum (Dep't Commerce May 17, 2019) ....................16

Certain Oil Country Tubular Goods from the Republic of Korea, 79 Fed. Reg. 41,983 (Dep't Commerce July 18, 2014) (AD inv. final determ.), and accompanying Issues and Decision Memorandum (Dep't Commerce July 10, 2014) ....................20

Certain Steel Nails from Taiwan, 84 Fed. Reg. 11,506 (Dep't Commerce Mar. 27, 2019) (final results AD admin. rev.; 2016-2017), and accompanying Issues and Decision Memorandum (Dep't Commerce Mar. 15, 2019) ....................10

Circular Welded Non-Alloy Steel Pipe from the Republic of Korea, 79 Fed. Reg. 37,284 (Dep't Commerce July 1, 2014) (final results AD admin. rev.; 2011-2012), and accompanying Issues and Decision Memorandum (Dep't Commerce June 24, 2014) ....................9

Initiation of Antidumping and Countervailing Duty Administrative Reviews, 89 Fed. Reg. 77,079 (Dep't Commerce Sept. 20, 2024) ....................4

Magnesium Metal from the Russian Federation, 76 Fed. Reg. 56,396 (Dep't Commerce Sept. 13, 2011) (final results AD admin. rev.), and accompanying Issues and Decision Memorandum (Dep't Commerce Sept. 6, 2011) ....................15

Pure Magnesium from Israel, 66 Fed. Reg. 49,349 (Dep't Commerce Sept. 27, 2001) (AD inv. final determ.), and accompanying Issues and Decision Memorandum (Dep't Commerce Sept. 14, 2001) ....................15

Utility Scale Wind Towers from the Republic of Korea, 91 Fed. Reg. 32,383 (Dep't Commerce, June 1, 2026) (final results AD admin. rev.; 2023-2024), and accompanying Issues and Decision Memorandum (Dep't Commerce May 26, 2026) .................... *passim*

Utility Scale Wind Towers from the Republic of Korea, 91 Fed. Reg. 2,907 (Dep't Commerce Jan. 23, 2026) (prelim. results of antidumping duty admin. rev.; 2023-2024), and accompanying Preliminary Decision Memorandum (Dep't Commerce Jan. 16, 2026)....................5, 12

Utility Scale Wind Towers from the Republic of Korea, 90 Fed. Reg. 19,672 (Dep't Commerce May 9, 2025) (final results AD admin. rev.; 2022-2023), and accompanying Issues and Decision Memorandum (Dep't Commerce May 2, 2025) .................... 13-14

Utility Scale Wind Towers from the Republic of Korea, 85 Fed. Reg. 40,243 (Dep't Commerce July 6, 2020) (AD inv. final determ.), and accompanying Issues and Decision Memorandum (Dep't Commerce June 29, 2020) ....................20

Welded Line Pipe from the Republic of Korea, 84 Fed. Reg. 27,762 (Dep't Commerce June 14, 2019) (final results AD admin. rev.; 2016-2017), and accompanying Issues and Decision Memorandum (Dep't Commerce June 7, 2019) ....................15

**MEMORANDUM IN SUPPORT OF MOTION FOR JUDGMENT UPON THE AGENCY RECORD**

Plaintiff, Dongkuk S&C Co. Ltd. (hereinafter, "DKSC" or "Plaintiff"), hereby submits this Memorandum in Support of its Motion for Judgment on the Agency Record in accordance with Rule 56.2(c) of the Rules of this Court. For the reasons set forth below, DKSC respectfully requests that the Court reverse the challenged determination of the U.S. Department of Commerce ("Commerce" or the "Department"), and remand with instructions consistent with this Memorandum and the Court's findings.

## I. STATEMENT PURSUANT TO RULE 56.2(C)

### A. Administrative Determination under Review

This action is an appeal from the Commerce's final results in Utility Scale Wind Towers from the Republic of Korea, 91 Fed. Reg. 32,383 (Dep't Commerce, June 1, 2026) (final results AD admin. rev.; 2023-2024) ("Final Results"), P.R. 3.[1] The challenged findings and conclusions of fact and law are set out primarily in Commerce's accompanying unpublished Memorandum to Christopher Abbott, Deputy Assistant Secretary for Policy and Negotiations, re: "Issues and Decision Memorandum for the Final Results of the 2023-2024 Administrative Review of the Antidumping Duty Order on Utility Scale Wind Towers from the Republic of Korea" (Dep't Commerce May 26, 2026) ("Final IDM"), P.R. 4.

[1] Documents contained in the administrative record are identified by the name and date of the documents, followed by the public ("P.R.") and confidential ("C.R.") index numbers assigned to these documents in the respective administrative record indices that Commerce filed with the Court on August 3, 2026. See ECF No. 13 (Aug. 3, 2026).

### B. Issues Presented

Plaintiff seeks judgment on the agency record with respect to the following two issues:

1. Whether Commerce's determination to exclude an offset for gains on the disposition of tangible assets for profits from the calculation of Plaintiff's reported general and administrative ("G&A") expense ratio was supported by substantial evidence where substantial record information demonstrated that related expenses cover most of the fiscal year ("FY") 2023 financial data, including nearly a full year's worth of G&A expenses on which the expense ratio at issue was based.

2. Whether Commerce's determination to calculate constructed value ("CV") profit and selling expenses using the simple average of the financial data of HanDu Steel Co., Ltd. ("HanDu"), Histeel Co., Ltd. ("HiSteel"), Husteel Co., Ltd. ("Husteel"), and SeAH Steel Corporation ("SeAH"), rather than DKSC's own above-cost home market sales information from the second administrative review, was supported by substantial evidence where the record evidence demonstrated surrogate companies engaged primarily in the production of merchandise that is very dissimilar from utility scale wind towers, whereas DKSC's own sales information represented home market profit experience for DKSC's actual production and sale in Korea of utility scale wind towers.

## II. STANDARD OF REVIEW

The Court has jurisdiction pursuant to 28 U.S.C. § 1581(c). In reviewing final results in antidumping duty administrative reviews, the governing statute provides that the Court shall hold unlawful and remand any administrative determination by Commerce that is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

Under Section 706 of the Administrative Procedures Act ("APA"), a reviewing Court will set aside any agency action that is inconsistent with the law. See 5 U.S.C. § 706(2)(A). When applying this standard, the APA provides that "the reviewing court shall decide all relevant questions of law {and} interpret constitutional and statutory provisions." Id. Courts, not agencies, decide "all relevant questions of law" arising on review of agency action. Id.; see also Loper Bright Enterprises v. Raimondo, 603 U.S. 369, 412, 144 S.Ct. 2244, 2273 (2024) (holding that "Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires . . . . {C}ourts need not and under the APA may not defer to an agency interpretation of the law simply because a statute is ambiguous").

The Court "will not allow an agency, under the guise of lawful discretion, to contravene or ignore the intent of the legislature or the guiding purpose of the statute." Ceramica Regiomontana, S.A. v. United States, 10 CIT 399, 405, 636 F. Supp. 961, 966 (1986), aff'd, 810 F.2d 1137 (Fed. Cir. 1987). An agency acts contrary to law if its decision making is arbitrary or unreasoned: "{a}gency action is arbitrary when the agency offer{s} insufficient reasons for treating similar situations differently." SKF USA Inc. v. United States, 263 F.3d 1369, 1382 (Fed. Cir. 2001).

The Court has found Commerce's determinations unsupported by substantial evidence "where Commerce has relied on inadequate facts or reasoning, or failed to provide an adequate basis for its conclusions." Rhone-Poulenc, Inc. v. United States, 20 CIT 573, 575, 927 F. Supp. 451, 454 (1996). Substantial evidence is "more than a mere scintilla," and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 619-20, 86 S.Ct. 1018, 1026 (1996) (quoting

Consolidated Edison Co. of New York v. NLRB, 305 U.S. 197, 229 (1938)); see also PAM, S.p.A. v. United States, 582 F.3d 1336, 1339 (Fed. Cir. 2009). In order for a determination to satisfy this standard, "{t}here must be a rational connection between the facts found and the choice made." Burlington Truck Lines v. United States, 371 U.S. 156, 168, 83 S.Ct. 239, 246 (1962); Nucor Corp. v. United States, 32 CIT 1380, 594 F.Supp.2d 1320, 1331-32 (2008). Additionally, "{t}he substantiality of evidence must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. NLRB, 340 U.S. 474, 488, 71 S.Ct. 456, 464 (1951).

## III. STATEMENT OF FACTS

On September 20, 2024, Commerce initiated the fourth administrative antidumping review of the utility scale wind towers from Korea covering the period of review ("POR"), i.e., August 1, 2023, through July 31, 2024. See Initiation of Antidumping and Countervailing Duty Administrative Reviews, 89 Fed. Reg. 77,079, 77,081 (Dep't Commerce Sept. 20, 2024), P.R. 106.

Between December 2024 and December 2025, DKSC submitted timely responses to Commerce's initial antidumping duty questionnaire and several supplemental questionnaires. DKSC explained in its initial questionnaire responses and supplemental questionnaire responses that certain tangible assets were not used to produce the merchandise under consideration during the POR and were sold during the 2023 portion of the POR, resulting in gains on the disposition of such tangible assets that DKSC treated as an offset to corresponding expenses included in the G&A expense ratio. See Letter from Trade Pacific PLLC, re: "Utility Scale Wind Towers from the Republic of Korea – DKSC's Section A Questionnaire Response" (Dec. 23, 2024) ("Sec. A QR"), at p. A-7, C.R. 58, P.R. 88; Letter from Trade Pacific PLLC, re: "Utility Scale Wind

Towers from the Republic of Korea – DKSC's Supplemental Section D Questionnaire Response" (Mar. 20, 2025) ("Sec. D SQR"), at p. SD-4, C.R. 27, P.R. 77; Letter from Trade Pacific PLLC, re: "Utility Scale Wind Towers from the Republic of Korea – DKSC's Second Supplemental Sections C and D Questionnaire Response" (Aug. 25, 2025) ("2nd Sec. CD SQR"), at p. SD2-4, Exhibit SD2-6, C.R. 20, P.R. 41.

On January 16, 2026, Commerce issued the preliminary results of the fourth administrative review in which it calculated a preliminary antidumping duty margin of 4.99 percent *ad valorem* for DKSC. See Utility Scale Wind Towers from the Republic of Korea, 91 Fed. Reg. 2,907 (Dep't Commerce Jan. 23, 2026) (prelim. results of antidumping duty admin. rev.; 2023-2024) ("Preliminary Results"), P.R. 26, and accompanying unpublished Memorandum to Christopher Abbott, Deputy Assistant Secretary for Policy and Negotiations, re: "Decision Memorandum for the Preliminary Results of the Administrative Review of the Antidumping Duty Order on Utility Scale Wind Towers from the Republic of Korea; 2023-2024" (Dep't Commerce Jan. 16, 2026) ("Prelim. Dec. Memo"), P.R. 27.

In its Preliminary Results, Commerce declined to include the income offset for gains on disposition of tangible assets for profits from DKSC's reported G&A expense ratio. See Prelim. Dec. Memo, at 10. Commerce also relied on surrogate sources to calculate CV profit and selling expense ratio instead of DKSC's actual, above-cost home market sales information from the second administrative review of the agency proceeding that covered 2021-2022 entries. Id., at 11-13.

In February and March of 2026, Plaintiff and the Wind Tower Trade Coalition (hereinafter, "petitioner") submitted case briefs and rebuttal briefs. In its case brief, Plaintiff argued that Commerce should: (1) include the income offset for gains on disposition of tangible

assets for profits from DKSC's reported G&A expense ratio because the tangible assets in question were sold in late 2023 and cover most of the FY 2023 financial data on which the G&A expense ratio was based; and (b) reverse its preliminary decision to calculate DKSC's CV profit and selling expense ratios using surrogate financial statements of companies that engage in the production of merchandise that is very dissimilar from utility scale wind towers, and instead use DKSC's actual, above-cost home market sales information from the second administrative review of the underlying proceeding. See Letter from Trade Pacific PLLC, re: "Utility Scale Wind Towers from the Republic of Korea – Case Brief" (Feb. 20, 2026), C.R. 6, P.R. 16.

On May 26, 2026, Commerce issued its Final Results in which it continued to calculate a weighted-average dumping margin of 4.99 percent *ad valorem* for DKSC. See Final Results, 91 Fed. Reg. at 32,383. As part of its final antidumping duty calculations, Commerce continued to exclude gains on the disposition of tangible assets from the calculation of DKSC's G&A expense ratio; and continued to rely upon the FY 2023 audited financial statements of HanDu, HiSteel, Husteel, and SeAH as the basis for approximating DKSC's home market profit and selling expense experience in the CV calculations. See Final IDM, at 3-14.

This appeal followed.

## IV. SUMMARY OF ARGUMENT

DKSC summarizes the arguments below on the following two issues raised in this memorandum of law:

(1) Commerce's determination to exclude the income offset for gains on disposition of tangible assets for profits from DKSC's reported G&A expense ratio was unsupported by substantial evidence. As DKSC explained in its questionnaire responses, the tangible assets in question were sold in late 2023, which means that these tangible assets incurred nearly a full

year's worth of G&A expenses that were covered by the FY 2023 financial data that formed the basis of the G&A expense ratio calculation. See Sec. A QR, at A-7; Sec. D SQR, at SD-4; 2nd Sec. CD SQR, at Exhibit SD2-6. Commerce's determination to capture the full amount of G&A expenses associated with the tangible assets without an offset of the gains on disposition of such assets—or, at the very least, excluding the line item for the "Loss on Disposition of Tangible Assets"—was unreasonable and unsupported by substantial evidence.

(2) Commerce's determination not to rely upon DKSC's actual, above-cost home market sales information from the second administrative review of this proceeding as the basis for CV profit and selling expenses was unsupported by substantial record evidence. The information from the second administrative review, which covered the period August 1, 2021, through July 31, 2022, demonstrably represented the best available source, and most reasonable method, on the record for calculating CV profit and selling expenses as it most closely approximated the statutory preference for using the actual home market profit experience of the "specific exporter or producer being examined" in the underlying administrative review. The surrogate sources upon which Commerce preliminarily relied, in contrast, reflected the production of merchandise that is non-comparable to utility scale wind towers. Commerce's determination seemingly was driven solely by the fact that DKSC's own CV profit and selling expense information predated the POR. But contemporaneity alone is not a reason to rely on less accurate, surrogate financial data from third-party companies when more specific data from the company being examined is available and that identical source has been used previously.

## V. ARGUMENT

### A. Commerce's Determination to Exclude Gains on the Disposition of Tangible Assets from the G&A Expense Ratio Calculation Was Not Supported by Substantial Evidence

As explained above in Section III ("Statement of Facts"), DKSC reported in its questionnaire responses that certain tangible assets were not used to produce the merchandise under consideration during the POR and were sold during the 2023 portion of the POR, resulting in gains on the disposition of such tangible assets that DKSC treated as an offset to corresponding expenses included in the G&A expense ratio. See Sec. A QR, at p. A-7. Among other things, DKSC explained that the account for "gains on disposition of tangible assets" represents "profit realized when a company sells or disposes of its tangible fixed assets—such as property, plant, or equipment—for an amount exceeding their book value" and that such "gains are classified as non-operating income because they are not derived from the company's core business activities." Sec. D SQR, at p. SD-4. In accordance with Commerce's supplemental requests, DKSC provided supporting documentation showing details for the various amounts associated with the disposition (sale) of the tangible assets in question. See 2nd Sec. CD SQR, at p. SD2-4, Exhibit SD2-6. Importantly, DKSC explained that the expenses associated with the tangible assets in question were recorded as part of G&A for FY 2023 as the disposition required extensive support of DKSC's legal, administrative, and accounting personnel, among others. In other words, while the sale of the tangible assets in question generated non-operating income (gains) because such sale was not associated with DKSC's core business activities, the expenses associated with those tangible assets incurred over the course of FY 2023 were captured as part of the calculated G&A expense ratio that was used to calculate DKSC's costs of production.

In its Final Results, Commerce excluded the gains on the disposition of tangible assets from the calculation of DKSC's G&A expense ratio, explaining that:

> {DKSC}'s income offset relates to the non-routine disposition of tangible fixed assets . . . {and that} this income is not derived from activities that occurred to support {DKSC}'s on-going production operations, given that {DKSC}'s primary areas of business are 'wind power generation, construction-related business, and new and renewable energy businesses,' not the manufacture or sale of assets such as the one at issue here.

Final IDM, at 4–5. Thus, Commerce excluded the gains associated with the disposition of the tangible assets in question but maintained all of the associated G&A expenses, thus artificially inflating the G&A expense ratio. In this respect, Commerce's determination was unreasonable and unsupported by substantial evidence.

Commerce previously has explained that it will include revenue/gains from ancillary activities as an offset in G&A ratio calculation because "{i}t is the Department's practice to include income offsets to G&A, if they relate to the general operations of the company as a whole and not to a separate line of business. The offsets do not have to be related directly to the production of subject merchandise." Certain Carbon and Alloy Steel Cut-to-Length Plate from France, 82 Fed. Reg. 16,363 (Dep't Commerce Apr. 4, 2017) (AD inv. final determ.), and accompanying Issues and Decision Memorandum (Dep't Commerce Mar. 29, 2017), at cmt. 13, citing Certain Cold-Rolled Carbon Steel Flat Products from Taiwan, 67 Fed. Reg. 62,104 (Dep't Commerce Oct. 3, 2002) (AD inv. final determ.), and accompanying Issues and Decision Memorandum (Dep't Commerce Sept. 23, 2002), at cmt. 6, and Circular Welded Non-Alloy Steel Pipe from the Republic of Korea, 79 Fed. Reg. 37,284 (Dep't Commerce July 1, 2014) (final results AD admin. rev.; 2011-2012), and accompanying Issues and Decision Memorandum (Dep't Commerce June 24, 2014), at cmt. 2.

Commerce specifically has offset G&A expenses with the gains on disposition of tangible (fixed) assets in other cases. See, e.g., Brake Rotors from the People's Republic of China, 69 Fed. Reg. 42,039 (Dep't Commerce July 13, 2004) (final results 9th AD new shipper rev.), and accompanying Issues and Decision Memorandum (Dep't Commerce July 6, 2004), at cmt. 1 (explaining that it offset G&A expenses with "income generated from the sale of fixed assets," reasoning that "like the losses associated with sales of fixed assets, the SG&A calculation should reflect an adjustment for both the profit and losses on these items."); Certain Steel Nails from Taiwan, 84 Fed. Reg. 11,506 (Dep't Commerce Mar. 27, 2019) (final results AD admin. rev.; 2016-2017), and accompanying Issues and Decision Memorandum (Dep't Commerce Mar. 15, 2019), at cmt. 2 (explaining that it offset G&A expenses with the "Gain on disposal of property, plant, and equipment" because while "the sale of an entire production facility or the fixed assets from a permanently closed plant is normally a non-routine disposition of fixed assets . . . there is no evidence in {the respondent's} financial statements that indicate that the value for this line item is from non-routine gains that would preclude it from its inclusion in G&A expenses").

In the present case, DKSC's claimed ancillary income offsets to G&A related to the general operations of the company and not to a separate line of business. While DKSC did not use the tangible assets in question to manufacture the merchandise under consideration during the POR, those assets were in place through most of FY 2023. See Sec. A QR, at A-7. The very nature of G&A expenses is that they relate to the general operations of a company rather than directly to the production processes, which means that the calculation includes expenses for parts of the business that do not relate directly to the production of merchandise or other core business activities. But Commerce imposed a double penalty onto DKSC when it maintained the G&A expenses associated with the tangible assets in question and refused to offset such expenses with

the gains on the disposition of such tangible assets even though they related to the general operations of DKSC as a whole.

Moreover, as demonstrated through Commerce's practice described above, the offsets to G&A do not have to relate directly to the production of subject merchandise. By denying the G&A offset because the income did not support DKSC's "on-going production operations" related to the merchandise under consideration, Final IDM, at 5, Commerce unreasonably deviated from its own practice and treated DKSC's situation differently from similar situations that it had examined previously. Commerce's failure to articulate a rational or adequate connection between the record evidence and the determination made renders the Final Results unreasonable and unsupported by substantial evidence with respect to this issue.

Accordingly, the Court should remand this case to Commerce with instructions to recalculate DKSC's G&A expense ratio including the full amount of the other operating income amount reported as the Gains on Disposition of Tangible Assets. At the very least, Commerce should be directed to exclude the "Loss on Disposition of Tangible Assets" line from the other operating expenses because DKSC provided substantial evidence on the record demonstrating that the losses recorded relate to the same activities that resulted in the gains on the disposition of tangible assets. See 2nd Sec. CD SQR, at Exhibit SD2-6.

### B. Commerce's Determination to Calculate CV Profit and Selling Expenses Using Financial Data of Surrogate Producers of Non-Comparable Merchandise Was Not Supported by Substantial Evidence

The statute directs Commerce to calculate CV based on the sum of the cost of materials and fabrication employed in producing the subject merchandise, plus amounts for selling, general, and administrative expenses, interest expenses, U.S. packing expenses, and profit. See 19 U.S.C. § 1677b(e). In accordance with 19 U.S.C. § 1677b(e)(2)(A) and Commerce's

longstanding practice, Commerce's preference is to base CV profit and selling expenses on "the actual amounts incurred and realized by the specific exporter or producer being examined in the investigation or review for selling, general, and administrative expenses, and for profits, in connection with the production and sale of a foreign like product, in the ordinary course of trade, for consumption in the foreign country." However, because all of DKSC's home market sales failed the "sales-below-cost" test, Commerce determined that it was unable to calculate CV profit and selling expenses sing the preferred method under 19 U.S.C. § 1677b(e)(2)(A) based on DKSC's actual home market sales information for the fourth administrative review period. See Prelim. Dec. Memo, at 10-11.

Where Commerce determines that it cannot calculate CV profit and selling expenses using a respondent's own home market (or third-country) sales information, 19 U.S.C. § 1677b(e)(2)(B) directs Commerce to use one of three alternative methods:

> (i) the actual amounts incurred and realized by the specific exporter or producer being examined in the investigation or review for . . . selling expenses and profits, in connection with the production and sale, for consumption in the foreign country, of merchandise that is in the same general category of products as the subject merchandise,
>
> (ii) the weighted average of the actual amounts incurred and realized by exporters or producers that are subject to the investigation or review (other than the exporter or producer described in clause (i)) . . . for selling expenses and profits, in connection with the production and sale of a foreign like product, in the ordinary course of trade, for consumption in the foreign country, or
>
> (iii) the amounts incurred and realized . . . for selling expense and profits, based on any other reasonable method, except that the amount allowed for profit may not exceed the amount normally realized by exporters or producers (other than the exporter or producer described in clause (i)) in connection with the sale, for consumption in the foreign country, of merchandise that is in the same general category of products as the subject merchandise; (i.e., the "profit cap").

This Court has emphasized that, when using these alternative methods, the "goal in calculating CV profit is to approximate the home market profit experience" for the production and sale of the merchandise under consideration. Geum Poong Corp. v. United States, 26 CIT 322, 327, 193 F.Supp.2d 1363, 1370 (2002).

Nevertheless, in its Final Results, Commerce determined to use the audited financial data of four surrogate Korean companies—HanDu, Histeel, Husteel, and SeAH—to calculate CV profit and selling expense ratios for DKSC, pursuant to 19 U.S.C. § 1677b(e)(2)(B)(iii), even though none of these entities manufactured utility scale wind towers. See Final IDM, at 9. Commerce's determination to use surrogate financial data of other companies, rather than DKSC's own above-cost, home market sales data from the second administrative review, was unreasonable and unsupported by substantial record evidence for the reasons described below.

**1. Commerce's Determination to Not Use DKSC's Own Actual Profit Data to Calculate the CV Profit and Selling Expense Ratios Was Unsupported by Substantial Record Evidence**

The administrative record contained CV profit and selling expense ratios calculated based on DKSC's above-cost, home market sales during the second administrative review period (2021-2022 entries). Commerce had accepted this exact source as the best available information for calculating DKSC's CV profit and selling expense ratios in the 2022-2023 administrative review, despite its lack of contemporaneity with that review period, reasoning that:

> In evaluating the alternatives on the record, we continue to find that CV profit and selling expenses from the prior review constitutes the best information available on the record. While Dongkuk's own data is less contemporaneous to the POR than the alternative data sources, we continue to find that the specificity of Dongkuk's data outweighs its contemporaneity. Of the alternatives available on the record, Dongkuk's profit experience best reflects its own business operations and products as it represents profit from wind towers produced by a Korean producer in Korea. Thus, this alternative best reflects the statutory preference, under section 773(e)(2)(A) of the Act, for calculating CV profit and selling expenses using the actual amounts incurred by the respondent. Moreover, we

> relied on such data in the prior administrative review of this proceeding. Likewise, this alternative eliminates some of the inherent flaws that occur with using surrogate financial statements (e.g., profits reflecting products that are not in the same general category of products as wind towers).
>
> . . .
>
> Further, we disagree that we should reject Dongkuk's CV selling expenses and profit data from the previous review because it is not contemporaneous with the POR. While contemporaneity is a factor Commerce considers when selecting a source for CV profit, the CIT and the U.S. Court of Appeals for the Federal Circuit (Federal Circuit) have affirmed Commerce's decision to rely on a respondent's CV profit data from outside the POR when other factors (e.g., country of sale and merchandise similarity) are prevailing. . . .

Utility Scale Wind Towers from the Republic of Korea, 90 Fed. Reg. 19,672 (Dep't Commerce May 9, 2025) (final results AD admin. rev.; 2022-2023), and accompanying Issues and Decision Memorandum (Dep't Commerce May 2, 2025) (footnotes omitted) (emphasis added).

But despite this recent, directly relevant precedent, Commerce rejected the CV profit and selling expense ratios based on DKSC's above-cost home market sales data from the 2021-2022 administrative review because Commerce had "several contemporaneous sources on the record of this review that reflect sales from Korean producers of comparable merchandise." Final IDM, at 9. Commerce's failure to offer sufficient reasons for treating the identical situation differently across two reviews was unreasonable and unsupported by substantial evidence showing, in fact, DKSC's own home market sales data from a relatively contemporaneous period represented the best available data on the record.

When choosing among potential surrogate companies under the "any reasonable method" alternative, Commerce has established the following criteria for consideration:

> (1) the similarity of the potential surrogate companies' business operations and products to the respondent's business operations and products;
>
> (2) the extent to which the financial data of the surrogate company reflects sales in the home market and does not reflect sales to the United States;

(3) the contemporaneity of the data to the period of investigation; and

(4) the similarity of the customer base between the surrogate company and the respondent.

Pure Magnesium from Israel, 66 Fed. Reg. 49,349 (Dep't Commerce Sept. 27, 2001) (AD inv. final determ.), and accompanying Issues and Decision Memorandum (Dep't Commerce Sept. 14, 2001), at cmt. 8.

In determining among different potential CV profit sources, Commerce has relied primarily on factors other than just contemporaneity. See, e.g., Certain Lined Paper Products from India, 76 Fed. Reg. 10,876 (Dep't Commerce Feb. 28, 2011) (final results AD admin. rev.), and accompanying Issues and Decision Memorandum (Dep't Commerce Feb. 18, 2011), at cmt. 3 ("the greater the similarity between business operations and products, the more likely that there is a greater correlation in the profit experience of the companies.").

Commerce's reasonable practice is to rely on less contemporaneous sources in favor of financial data with more compelling specificity. See, e.g., Welded Line Pipe from the Republic of Korea, 84 Fed. Reg. 27,762 (Dep't Commerce June 14, 2019) (final results AD admin. rev.; 2016-2017), and accompanying Issues and Decision Memorandum (Dep't Commerce June 7, 2019), at cmt. 4 (relying on Hyundai's profit ratio and selling expense information from the first administrative review because the contemporaneous financial statements were incomplete and less specific); Magnesium Metal from the Russian Federation, 76 Fed. Reg. 56,396 (Dep't Commerce Sept. 13, 2011) (final results AD admin. rev.), and accompanying Issues and Decision Memorandum (Dep't Commerce Sept. 6, 2011), at cmt. 1.B (relying on a respondent's sales data from the prior review to calculate CV profit and selling expense ratios).

Also relevant is the fact that, in prior cases, Commerce has used financial information that were two years removed from the period covered to calculate CV profit ratios. See, e.g.,

Certain Oil Country Tubular Goods from the Republic of Korea, 84 Fed. Reg. 24,085 (Dep't Commerce May 24, 2019) (final results AD admin. rev.; 2016-2017) ("OCTG from Korea"), and accompanying Issues and Decision Memorandum (Dep't Commerce May 17, 2019), at cmt. 2 (in the third administrative review, Commerce used respondent SeAH's own profit and selling expenses calculated in the first administrative review of the same proceeding because SeAH's CV profit and selling expense ratios: (a) reflected the profit and selling experiences of a Korean OCTG producer; (b) were based on OCTG sales to a viable comparison market; and (c) were derived from sales made in the ordinary course of trade),[2] citing Atar S.r.l. v. United States, 730 F.3d 1320, 1323, 1329 (Fed. Cir. 2013) (upholding the use of sales from other mandatory respondents in the prior administrative review to calculate surrogate profit and selling expense ratios); Certain Frozen Warmwater Shrimp from Ecuador, 71 Fed. Reg. 34,888, 34,891-92 (Dep't Commerce June 16, 2006) (prelim. results AD new shipper rev.) (Commerce relied on other respondents' actual weighted-average CV profit data that "covers a time frame that is not contemporaneous with the POR").

In summary, Commerce failed to provide an adequate or reasonable explanation for its abrupt departure from its determination in the immediately preceding review. In that review,

---

[2] This Court reviewed and sustained Commerce's determination in the 2016-2017 administrative review of OCTG from Korea regarding the use of the respondent's data from a prior review to calculate CV profit and selling expense ratios. See SeAH Steel Corp. v. United States, 513 F.Supp.3d 1367, 1398 (Ct. Int'l Trade 2021) ("The court regards as reasonable Commerce's explanation that SeAH's financial data are specific and relate to a Korean producer conducting production in Korea and are more accurate than surrogate financial statements from non-Korean producers or regarding a product other than OCTG. The court concludes that Commerce's use of SeAH's OCTG I data is reasonable and supported by substantial evidence."); see also Certain Oil Country Tubular Goods from the Republic of Korea, 87 Fed. Reg. 55,398 (Dep't Commerce Sept. 9, 2022) (amended final results AD review; 2016-2017) (noting that "the court sustained Commerce's determinations with respect to calculation of constructed value profit based on SeAH's third-country sales from a previous segment of the proceeding").

Commerce correctly emphasized that specificity "outweighs" contemporaneity when selecting from among potential surrogate sources, and that a less contemporaneous source is better than a source whose financial data reflects the manufacture and sale of products that are dissimilar to wind towers. Yet, in its Final Results, Commerce relied on alternative sources that were afflicted by the "inherent flaws" of using surrogate financial statements given the lack of similarity of the merchandise produced because they were contemporaneous with the POR. But contemporaneity alone is not a reason to rely on less accurate, surrogate financial statements from third-party companies when more specific data is available. And in this case, the record contained substantial evidence in the form of profit data for the Korean wind tower producer being examined (i.e., DKSC) based on its home market sales data for the foreign like product made in the ordinary course of trade (i.e., above the cost of production). In view of Commerce's practice and previously stated framework, Commerce's determination not to use DKSC's own actual profit data as the basis for CV profit and selling expenses—despite the fact that it was the only record source that approximated the statutory preference for using the actual home market profit experience of the "specific exporter or producer being examined" for the subject merchandise—was unreasonable and unsupported by substantial evidence.

**2. Commerce's Determination to Use the Financial Data of Husteel and SeAH Was Unsupported by Substantial Evidence**

In its Final Results, Commerce relied upon the FY 2023 audited financial statements of four Korean companies—i.e., HanDu, HiSteel, Husteel, and SeAH—as the basis for approximating DKSC's home market profit and selling expense experience in the CV calculations. See Final IDM, at 3-14. Although it is true that these companies engage in production and sales operations in the foreign country, i.e., Korea, nothing on Commerce's record indicate that any of these four companies produced the merchandise under consideration,

i.e., utility scale wind towers, or for that matter any merchandise that is within the "same general category of merchandise" as wind towers. DKSC addresses below this issue specifically with respect to the inclusion of the financial data of Husteel and SeAH.[3]

Commerce's use of SeAH's and Husteel's financial data in the Final Results to calculate DKSC's CV profit and selling expense ratios contradicts Commerce's practice and its own reasoning provided in the same Final IDM. For example, Commerce rejected the surrogate financial data of two Korean producers of wind towers, Win&P, Ltd. and SK Oceanplant Co., Ltd., because: (1) the companies had substantial transactions with affiliated parties; and (2) their respective financial statements did not break down total revenue by product group, making it impossible to determine what portion of profit was generated from comparable versus non-comparable merchandise. See Final IDM, at 12–13; see also Letter from Trade Pacific PLLC, re: "Response to Petitioner's Pre-Preliminary Comments" (Nov, 20, 2025), at 2, 4, 7–9 ("DKSC's November 20th Letter"), P.R. 35; Letter from Trade Pacific PLLC, re: "Utility Scale Wind Towers from the Republic of Korea – CV Profit and Selling Expense Comments and Information" (Mar. 5, 2025), at 4-8, P.R. 71.

Despite the fact that Win&P and SK Oceanplant were far more representative of DKSC than SeAH and Husteel in terms of similarity of merchandise, Commerce accepted the latter two sources, explaining that "while both SeAH and Husteel produce some non-comparable merchandise and use different raw materials, we find that their financial statements include profits for comparable merchandise in the Korean market." Final IDM, at 12. Commerce

---

[3] In its case brief to Commerce, DKSC did not oppose the inclusion of the financial data for Histeel or Handu in the calculations, but it maintained that those surrogate sources are less reliable than using DKSC's own above-cost home market sales data from the second administrative review.

offered no reasoned analysis for why the same conclusion could not be reached regarding the financial data of Win&P and SK Oceanplant. None of Commerce's justifications withstand scrutiny because all the purported "faults" found with respect to Win&P and SK Oceanplant also existed in the financial data of SeAH and Husteel. Id., at 10–13.

First, SeAH reported more than 83 percent of the total sales in its financial statements to SeAH Steel America, Inc., an affiliate engaged only in distribution and resales outside of Korea. See DKSC's November 20th Letter, at 7, citing Letter from Wiley Rein LLP, re: "Constructed Value Profit and Selling Expense Comments and Information" (Mar. 5, 2025), at Exhibits 1 and 7, P.R. 59, 64; see also Letter from Trade Pacific PLLC, re: "CV Profit and Selling Expense Rebuttal Comments and Information" (Mar. 12, 2025) ("DKSC's CV Profit Rebuttal Cmts"), at 5, P.R. 53. In its Final IDM, Commerce presented a different number, stating that "only 34.8 percent of its total sales were to SSA." Final IDM, at 11. Then, in the footnote, Commerce noted that "{t}he remaining 29.1 percent of SeAH's sales are export sales or sales of 'Merchandise, etc.' We note that SeAH's financial statements do not segregate the company's export sales by specific markets." Id. Nevertheless, Commerce failed to acknowledge the fact that that a significant portion of SeAH's revenue covers sales to the United States, and specifically to its affiliate. This reason alone should have removed SeAH from consideration as a potential source in view of Commerce's stated criteria for selection of CV profit sources that it used as its reasoning when excluding other sources.

Second, Commerce created an exception for Husteel when it recognized that Husteel's major raw material input is hot-rolled coil and stainless steel—and not heavy steel plates that DKSC consumes in the production of wind towers—yet Commerce chose to use Husteel's financial data as a "best available" source for CV profit ratio. Id., at 12. The record evidence

also showed that 96.7 percent of Husteel's FY 2023 sales were for OCTG and structural steel pipes from hot-rolled coil or stainless steel. See DKSC's CV Profit Rebuttal Cmts, at 7-8, Ex. CVR-5, P.R. 53. Commerce provided no analysis or support that suggested these products were, in any way, comparable to wind towers (because they are not). Commerce's determination was unreasonable in view of substantial evidence establishing that Husteel is not a producer of comparable merchandise and whose manufacturing processes do not consume heavy steel plates as DKSC does in its own manufacturing operations. See DKSC's CV Profit Rebuttal Cmts, at 7.

Third, Commerce rejected the financial data of SK Oceanplant based on the reasoning that the company's financial statements did not segregate revenues between comparable and non-comparable merchandise. See Final IDM, at 12–13. Yet, Commerce did not apply that same reasoning to exclude SeAH's and Husteel's financial statements because they do not break out what portion of total revenue comes from non-comparable merchandise—such as OCTG—versus any comparable merchandise.

Fourth, both SeAH and Husteel are known major producers of OCTG. Yet, Commerce failed to recognize its own reasoning in the original investigation of the underlying proceeding that "OCTG, a specialized premium pipe product {} **is not comparable** to wind towers." Utility Scale Wind Towers from the Republic of Korea, 85 Fed. Reg. 40,243 (Dep't Commerce July 6, 2020) (AD inv. final determ.), and accompanying Issues and Decision Memorandum (Dep't Commerce June 29, 2020), at cmt. 8 (emphasis added).[4] As such, had Commerce followed its

[4] OCTG is a highly specialized product used for oil and gas applications, entirely distinct from utility scale wind towers. See generally Certain Oil Country Tubular Goods from the Republic of Korea, 79 Fed. Reg. 41,983 (Dep't Commerce July 18, 2014) (AD inv. final determ.), and accompanying Issues and Decision Memorandum (Dep't Commerce July 10, 2014), at cmt. 1 (explaining that OCTG sales and demand are driven by oil and gas exploration and production).

practice to exclude OCTG producers, Commerce would have excluded both SeAH and Husteel from Commerce's consideration for CV profit ratio. Accordingly, Commerce's calculation must be revised as not supported by substantial evidence.

For all these reasons, the Court should hold that Commerce's reliance of surrogate financial data of four companies that did not produce identical merchandise or merchandise within the same general category—especially SeAH and Husteel—for purposes of calculating DKSC's CV profit and selling expense ratios was unsupported by substantial record evidence.

## VI. CONCLUSION

For the reasons set forth above, the Final Results issued by Commerce in the 2023-2024 administrative review of the antidumping duty order against Utility Scale Wind Towers from Korea were not supported by substantial evidence. Therefore, Plaintiff respectfully requests that the Court grant Plaintiff's Rule 56.2 Motion for Judgment on the Agency Record and remand this case to Commerce with instructions to recalculate DKSC's weighted-average dumping margin in a manner consistent with the Court's opinion in this action.

Respectfully submitted,

/s/ Jarrod M. Goldfeder
Jarrod M. Goldfeder
MacKensie R. Sugama
Joo Young (Adelia) Kim

**TRADE PACIFIC PLLC**
700 Pennsylvania Avenue, SE
Suite 500
Washington, D.C. 20003
(202) 223-3760

Dated: October 13, 2026

*Counsel to Plaintiff Dongkuk S&C Co. Ltd.*

**UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: THE HONORABLE LEO M. GORDON, SENIOR JUDGE

| | |
|---|---|
| DONGKUK S&C CO. LTD., Plaintiff, v. UNITED STATES, Defendant, and WIND TOWER TRADE COALITION, Defendant-Intervenor. | Court No. 26-03136 |

**<u>CERTIFICATE OF COMPLIANCE</u>**

The undersigned counsel at Trade Pacific PLLC hereby certifies that the Memorandum of Law in Support of Plaintiff's Rule 56.2 Motion for Judgment on the Agency Record, dated October 13, 2026, complies with the word-count limitation described in the Standard Chambers Procedures. The memorandum of law contains 6,420 words according to the word-count function of the word-processing software used to prepare the memorandum, excluding the table of contents, table of authorities, and undersigned counsel's signature block.

Respectfully submitted,

<u>/s/ Jarrod M. Goldfeder</u>
Jarrod M. Goldfeder
**TRADE PACIFIC PLLC**
700 Pennsylvania Avenue, SE, Suite 500
Washington, D.C. 20003
(202) 223-3760

Dated: October 13, 2026

*Counsel to Plaintiff Dongkuk S&C Co. Ltd.*